IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**CEDRIC NESBIT**                                                           **PLAINTIFF**

**VS.**                                      **CAUSE NO. 3:21-CV-0003-MPM-JMV**

**MISSISSIPPI DEPARTMENT OF TRANSPORTATION**              **DEFENDANT**

**<u>ORDER</u>**

This cause comes before the court on the motion of defendant Mississippi Department of Transportation (MDOT) for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Cedric Nesbit has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a Title VII race discrimination action arising out of plaintiff's January 21, 2020 termination as an MDOT maintenance technician,[1] after he had been on the job for less than six months. Plaintiff's notice of termination was hand-delivered to him by his supervisor Jimmy Brooks, who claims that the firing was based on job performance issues. In his complaint, plaintiff, an African-American male, asserts that the real reason for his termination was racial animus based on Brooks' disapproval of interracial relationships. In a declaration supporting his

---

[1] In his complaint, plaintiff also asserts a claim for race discrimination under 42 U.S.C. § 1981, but he has failed to respond to defendant's argument, based on *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), that "[t]here is no basis for Plaintiff to assert a claim of race discrimination under § 1981 against a public employer." [Brief at 3, fn. 5]. *See also Hervey v. Mississippi Dep't of Educ.,* 2010 WL 88901, at *7 (S.D. Miss. Jan. 6, 2010), *aff'd*, 404 F. App'x 865 (5th Cir. 2010). This court accordingly regards defendant's argument in this regard as having been conceded, and it will consider this case solely within the context of Title VII.

1

response to the motion for summary judgment, plaintiff asserts that Brooks personally told him about his dislike of such relationships, [Exhibit A at 1] and he maintains that his firing occurred soon after Brooks saw him in the presence of the son of his white girlfriend, whom plaintiff refers to as his "stepson."[2] [Complaint at 2].

In his complaint, plaintiff alleges that, upon seeing the boy on a visit to the workplace, "Brooks expressed that there was no way his father was a black man" and that "within a few hours, Plaintiff was abruptly terminated." [*Id.* at 2]. For its part, defendant maintains that, by the time of his firing, plaintiff had already been notified of deficiencies in his job performance and that the actual firing occurred "at least eleven days after the request for termination had been submitted." [Brief at 3]. Defendant further notes that plaintiff's sworn declaration includes alleged proof of discrimination which he failed to mention in his deposition, and it accordingly argues that the declaration is not worthy of credence. Before addressing the parties' disagreements regarding the proof in this case, this court will discuss the applicable legal standards.

Under Title VII it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may prove discrimination by direct or circumstantial evidence. *Salinas v. AT & T Corp.*, 314 Fed. Appx. 696, 698 (5th Cir.2009) (quoting Fed. R. Civ. P. 56(c).; *Nasti v. CIBA Specialty Chems* ., 492 F.3d 589, 593 (5th Cir.2007). Under the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) burden-shifting framework, a plaintiff may circumstantially make out a *prima facie* case of

---

[2] This court notes that, strictly speaking, the child is not plaintiff's stepson, since he is not married to his mother. This court will nevertheless follow plaintiff's designation for the child in this order.

2

discrimination by demonstrating (1) that he belongs to a protected group; (2) he was qualified for the position held; (3) he suffered an adverse employment action, and (4) he was replaced by someone outside the protected class or was treated less favorably than other similarly situated employees. *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir. 1995). Assuming he does so, the employer must rebut a presumption of discrimination and articulate legitimate, nondiscriminatory reasons for the adverse employment action. *Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001). The plaintiff may then attempt to establish that the stated reason for discrimination is either pretextual or that race discrimination was one motivating factor for his termination. *Id.*

After reviewing the summary judgment evidence in this case, this court concludes that plaintiff's circumstantial proof that he was terminated on the basis of his race is not sufficiently strong to allow him to survive summary judgment solely on the basis of the *McDonnell Douglas* framework without additional, more direct, proof of discrimination. Plaintiff maintains that he has such proof, in the form of Brooks' alleged statements expressing disapproval of interracial relationships. This is significant, since defendant itself characterizes Brooks as "the supervisor who ultimately terminated Plaintiff" [brief at 5], and it further acknowledges that the Fifth Circuit Court of Appeals "has recognized that … Title VII prohibit[s] discrimination against an employee on the basis of a personal relationship between the employee and a person of a different race," *Floyd v. Amite County Sch. Dist.,* 581 F.3d 244, 249 (5th Cir.2009). [*Id.* at 5].

It thus seems clear that, if plaintiff has sufficiently strong proof that Brooks' firing of plaintiff was motivated by a dislike of his being involved in an interracial relationship, then this would serve to establish triable fact issues regarding his Title VII claim. After considering the summary judgment evidence, this court concludes that the proof of Brooks' alleged racial animus is far from overwhelming, but that, in light of the deferential standard of review on summary

3

judgment, it is sufficient to go to trial. In so stating, this court acknowledges that plaintiff's summary judgment evidence relies heavily upon his own unsubstantiated assertions regarding remarks allegedly made by Brooks. For example, plaintiff argues in his brief that:

> Mr. Nesbit is an African-American male in a long-term interracial relationship with a white female. He was employed by MDOT as a Maintenance Technician from September 1, 2019, until his unlawful termination on January 21, 2020. During the relevant time, Mr. Nesbit's direct supervisor was Jimmy Brooks, a white male. Mr. Nesbit's girlfriend picked him up from work several times in view of Mr. Brooks. In late 2019, Mr. Nesbit rode back to the office with Mr. Brooks as they talked about women and relationships. Id. at ¶ 4. During that conversation, Mr. Brooks mentioned that he did not think Black people and whites should mix in intimate relationships. On January 21, 2020, Mr. Brooks terminated Mr. Nesbit. On the same day, Mr. Brooks questioned the son of Mr. Nesbit's white girlfriend as to how he could be related to Mr. Nesbit in a manner that indicated disgust and disapproval of interracial relationships. Mr. Nesbit was never issued any written discipline or corrective action prior to his termination as to any of the alleged offenses that Defendant relies on to support his termination. In fact, during his short tenure with Defendant he was given a pay increase. After being terminated, Mr. Nesbit contacted Human Resources to report that he believed he was discriminated against based one his race and was told "that's what they all say." Defendant did not conduct any investigation into his allegations in violation of its own policies.

[Brief at 1-2, record citations omitted].

In its reply brief, defendant attacks the credibility of plaintiff's arguments quoted above, arguing that:

> In response, Plaintiff offers two unavailing arguments. First, Plaintiff relies on Chapter 7 of the Mississippi State Employee Handbook. Plaintiff spends two of four pages arguing that Plaintiff did not get written reprimands as discussed in Chapter 7. Unfortunately, however, the sections of the Handbook that Plaintiff cites are simply not applicable to probationary employees. Specifically, Chapter 7 of the handbook [ECF. 26-3] (Ch. 7 p. 48), entitled "Discipline, Corrective Action and Separation of Employment", specifically states that "This provision does not apply to persons separated from employment ….(2) during the initial twelve (12) month probationary period in State Service……(emphasis added). Plaintiff was not entitled to the progressive disciplinary process outlined in Chapter 7, by its own words. Plaintiff's second attempt at avoiding summary judgment is the introduction of a self-serving Affidavit by Plaintiff, much of which contradicts Plaintiff's own deposition testimony. These contradictory and self-serving statements cannot defeat summary judgment.
>
> For instance, in his deposition, Plaintiff was crystal clear that Mr. Brooks not only sought him out to come to work at MDOT, but also told him to reapply three (3) months after the date of his termination. [ECF Doc. 26-2, pp 22-24].2 Does that indicate racial animus? Of course not. Second, Plaintiff in his own words described a comfortable working relationship

> with Mr. Brooks, stating in his deposition that he "ain't never had no problem with Mr. Brooks" until the day his "stepson" was dropped off the bus at the MDOT facility – January 21, 2020. ECF Doc 26-2, Id.
>
> Plaintiff now attempts to buttress his claim that Brooks knew of his interracial relationship by stating in his affidavit that "[m]y girlfriend picked [me] up from work several times in view of Mr. Brooks." [ECF Doc. 31-1 at ¶3.] Notably, Plaintiff completely failed to recall that during his deposition, and again, specifically said Brooks did not know of his interracial relationship until January 21, 2020 when his white "stepson" was dropped off at the facility. Further, Plaintiff shifts his description of an alleged conversation in 2019 during which Brooks allegedly made a statement that he "don't interact with racial relationships anyway. And I didn't say nothing to him because I knew he didn't know I dated outside my race or whatever." [ECF Doc. 26-2 at 25]. If there were others that heard this conversation, where are their affidavits? Why weren't they disclosed as having discoverable information? Contrary to his deposition testimony, where he and Brooks were riding alone, Plaintiff's new-found memory sworn to in his affidavit states that "[i]n late 2019, I rode back to the office with Mr. Brooks as they talked about women and relationships. During that conversation, Ms. Brooks mentioned that he did not think blacks and whites should mix in intimate relationships." [ECF Doc. 31-1, ¶4.] He had every opportunity in his deposition to identify who, if anyone, was present during during the remarks he now claims were made. These changes in Plaintiff's deposition testimony and his affidavit testimony simply do not pass muster and cannot defeat Defendant's motion for summary judgment.

[Reply brief at 2-4].

It appears that, in making these arguments, defendant is essentially claiming that plaintiff is lying in his declaration when he writes that he personally heard Brooks make statements disapproving of interracial dating. After reviewing the record evidence, it strikes this court as quite possible that a jury will reach a similar conclusion at trial and return a defense verdict on the basis of this conclusion. At the summary judgment stage, however, this court is required to view the facts in the light most favorable to plaintiff, and this makes it quite difficult for this court to simply proclaim that a plaintiff is lying. This is particularly true considering that many of the alleged discrepancies between plaintiff's deposition testimony and his declaration are, at least arguably, explainable. To reiterate, defendant writes in his brief that:

> Plaintiff now attempts to buttress his claim that Brooks knew of his interracial relationship by stating in his affidavit that "[m]y girlfriend picked [me] up from work several times in view of Mr. Brooks." [ECF Doc. 31-1 at ¶3.] Notably, Plaintiff completely failed to recall that

5

during his deposition, and again, specifically said Brooks did not know of his interracial relationship until January 21, 2020 when his white "stepson" was dropped off at the facility. *Id.* In the court's view, this alleged discrepancy could, at least arguably, be explained by the fact that the act of picking up someone from work is less definitive proof of an interracial relationship than being seen with a "stepson" of a different race. That being the case, plaintiff may attempt to persuade the jury that at trial, during his deposition, he intended to state that Brooks only received *definitive* proof of his interracial relationship when he saw his white "stepson."

This court further notes that, while plaintiff did neglect to mention certain important alleged evidence of discrimination at his deposition, he repeatedly testified regarding rumors which he heard among co-workers regarding Brooks' negative view of interracial dating. For example, plaintiff testified in his deposition that:

> A. No, I ain't never had no problem with Mr. Brooks only until the day my stepson came up there on his birthday and got dropped off on the bus. And some of the guys was out there. We was sitting around before we got off. Some of the guys that worked there -- I don't want to bring their name up any, but they was kind of telling me Mr. Brooks was kind of -- don't like interrelationships, you know. And I just chuckled about it, laughed about it.
> And he was in the break room looking, and they said, "Well, he's trying to see who's going to get dropped off." And I didn't think nothing about it, you know. The guy I went to church with, he told me, he said, "Mr. Brooks not going to like that," you know, and started laughing about it. After Mason got dropped off on the bus, told Mason to go in the break room. And asked Mason what he doing up here to see a black guy, you know, like that. That's what my stepson told me. "Are you sure you're up here to see a black guy?" Mason said he looked at him and kind of rolled his eyes and went in there and sat down. He told Mason to start doing his homework. And Mason said he just didn't say nothing to him and started doing his homework and watching TV. And I guess about 15 minutes, he called me in his office and tell me -- give me some papers showing -- said I'm no longer needed here. It didn't work out.

[Deposition at 23-24].

Even assuming that plaintiff was relying upon hearsay statements in so testifying at his deposition,[3] he was, as a non-attorney, presumably unaware of this fact. That being the case, plaintiff

---

[3] Needless to say, this court will fully enforce the applicable hearsay rules at trial, and, that being the case, plaintiff would be well advised to have persuasive arguments for the admissibility of any out of court statements allegedly made by Brooks which plaintiff did

may well have believed that he was offering strong evidence regarding Brooks' bias against interracial dating in his deposition, and it would be unfair to argue that this is an allegation which he raised for the first time in his declaration. True enough, it can be argued that, by submitting his declaration, plaintiff was seeking to buttress his deposition testimony by providing non-hearsay statements regarding Brooks' biases.[4] The fact that a plaintiff would seek to so buttress his case does not necessarily mean that he is lying, however, and he may simply argue that he was providing additional details regarding Brooks' biases which he failed to mention in his deposition.

By suggesting that plaintiff is lying in his declaration, defendant appears to tacitly acknowledge that, if his declaration is true, then it would tend to create genuine fact issues regarding whether race discrimination was at least a motivating factor in his termination. In this vein, it should be noted that, as modified in 1991, Title VII permits plaintiffs to survive summary judgment if they can demonstrate, either directly or circumstantially, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L.Ed.2d 84 (2003). This "motivating factor" standard is considerably more forgiving than the one which confronts ADEA and Title VII retaliation plaintiffs, who must demonstrate that age discrimination or retaliation was a "but for" cause of any adverse employment action. *See Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2351, 174 L.Ed.2d 119 (2009); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 338, 133 S. Ct. 2517, 2520, 186 L. Ed. 2d 503 (2013).

---

not personally hear him make. This will most likely require plaintiff to offer the testimony of his former co-workers regarding any such statements which led them to believe that Brooks disapproved of interracial dating.

[4] In so stating, this court notes that, if plaintiff testifies that he personally heard Brooks make certain remarks, then this would presumably not constitute hearsay, since (among other reasons) it would be properly regarded as an admission by a party opponent.

In light of the availability of the "mixed motive" option in Title VII discrimination cases, it is entirely possible that a jury could conclude that *both* racial animus and concerns regarding plaintiff's job performance were motivating factors in Brooks' decision to fire him and return a plaintiff's verdict on the basis of this conclusion. This court therefore does not regard the parties' competing arguments regarding the quality of plaintiff's work performance as offering a basis for resolving this case on summary judgment, particularly since there is, very often, a subjective quality to issues of job performance. Moreover, while this court will readily agree with defendant that it has potentially strong jury arguments that plaintiff was less than truthful in his declaration, it is, as stated previously, unwilling to proclaim on summary judgment that this is the case. This court therefore concludes that, while plaintiff's proof of race discrimination in this case is far from overwhelming, it is sufficient to go to trial. Defendant's motion for summary judgment will therefore be denied as to plaintiff's Title VII claims, although it will, as noted previously, dismiss plaintiff's § 1981 claims. *See* footnote 1.

It is therefore ordered that defendant's motion for summary judgment is denied as to plaintiff's Title VII claims and granted as to his § 1981 claims.

This, the 2nd day of May, 2022.

/s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**